AO 442 (Rev 11/11) Arrest Warrant

ORIGINAL

FILED BY_____MP_____D.C.

**May 8, 2024**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

# UNITED STATES DISTRICT COURT

for the

Eastern District of Virginia

United States of America

v.

Anyelo Jesus Muino Ayala

*Defendant*

)
)
)
)
)
)

Case No. 2:24cr28

FID: 1166927

FBI

**INFORMATION COPY ONLY**

**NOTICE: BEFORE ARREST, VALIDATE THROUGH NCIC. ORIGINAL HELD BY U.S. MARSHAL.**

## ARREST WARRANT

24-2924-MJ-MCCABE

To:      Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

*(name of person to be arrested)*   Anyelo Jesus Muino Ayala                                    ,

who is accused of an offense or violation based on the following document filed with the court:

☑ Indictment      ☐ Superseding Indictment      ☐ Information      ☐ Superseding Information      ☐ Complaint

☐ Probation Violation Petition      ☐ Supervised Release Violation Petition      ☐ Violation Notice      ☐ Order of the Court

This offense is briefly described as follows:

T.18:1962(d) - Racketeer Influenced and Corrupt Organizations (RICO) Conspiracy, count one, et al

Date:      04/18/2024

*Issuing officer's signature*

City and state:      Norfolk, Virginia                              Lawrence R. Leonard, United States Magistrate Judge

*Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____ at *(city and state)* _____ |
| Date: _____       _____ *Arresting officer's signature* |
|        _____ *Printed name and title* |

ORIGINAL

AO 442 (Rev. 11/11) Arrest Warrant

**FILED BY** ___MP___ **D.C.**

**May 8, 2024**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

# UNITED STATES DISTRICT COURT

for the

Eastern District of Virginia

INFORMATION
COPY ONLY

SEALED

United States of America
v.

Idalberto Rivero

*Defendant*

)
)
)  Case No.  2:24cr28
)  EID: 44
)
)  FBI

NOTICE: BEFORE ARREST, VALIDATE
THROUGH NCIC. ORIGINAL
HELD BY U.S. MARSHAL.

## ARREST WARRANT

**24-2924-MJ-MCCABE**

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)*   Idalberto Rivero

who is accused of an offense or violation based on the following document filed with the court:

☑ Indictment   ☐ Superseding Indictment   ☐ Information   ☐ Superseding Information   ☐ Complaint
☐ Probation Violation Petition   ☐ Supervised Release Violation Petition   ☐ Violation Notice   ☐ Order of the Court

This offense is briefly described as follows:

T.18:1962(d) - Racketeer Influenced and Corrupt Organizations (RICO) Conspiracy, count one, et al

Date:     04/18/2024

*Issuing officer's signature*

City and state:     Norfolk, Virginia

Lawrence R. Leonard, United States Magistrate Judge
*Printed name and title*

| Return |
| --- |
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____ at *(city and state)* _____ |
| Date: _____          _____ <br> *Arresting officer's signature* <br><br> _____ <br> *Printed name and title* |

AO 442 (Rev. 11/11) Arrest Warrant

ORIGINAL

FILED BY ___MP___ D.C.

May 8, 2024

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. – MIAMI

# UNITED STATES DISTRICT COURT
for the
Eastern District of Virginia

United States of America
v.

Raul Ferrao Pons

*Defendant*

Case No. 2:24cr28

FBI

INFORMATION COPY ONLY

NOTICE: BEFORE ARREST VALIDATE THROUGH AGENCY HOLDING WARRANT NCIC HELD BY U.S. MARSHAL

## *24-2924-MJ-MCCABE*
## ARREST WARRANT

To:      Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)*   Raul Ferrao Pons

who is accused of an offense or violation based on the following document filed with the court:

☑ Indictment   ☐ Superseding Indictment   ☐ Information   ☐ Superseding Information   ☐ Complaint
☐ Probation Violation Petition   ☐ Supervised Release Violation Petition   ☐ Violation Notice   ☐ Order of the Court

This offense is briefly described as follows:

T.18:1962(d) -  Racketeer Influenced and Corrupt Organizations (RICO) Conspiracy, count one, et al

Date:      04/18/2024

*Issuing officer's signature*

City and state:   Norfolk, Virginia

Lawrence R. Leonard, United States Magistrate Judge
*Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____ at *(city and state)* _____ . |
| Date: _____ |
| _____ *Arresting officer's signature* |
| _____ *Printed name and title* |

AO 442 (Rev. 11/11) Arrest Warrant

ORIGINAL

FILED BY _____ MP _____ D.C.

**May 8, 2024**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

# UNITED STATES DISTRICT COURT

for the

Eastern District of Virginia

United States of America
v.

Luis Gustavo Diaz

)
)
)
)
)
)

Case No.  2:24cr28

FID: H66H29H
FBI

_____
*Defendant*

INFORMATION
COPY ONLY
SEALED

NOTICE: BEFORE ARREST, VALIDATE
THROUGH NCIC ORIGINAL
HELD BY U.S. MARSHAL.

## ARREST WARRANT

## 24-2924-MJ-MCCABE

To:   Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)*   Luis Gustavo Diaz                                                                ,
who is accused of an offense or violation based on the following document filed with the court:

☑ Indictment          ❏ Superseding Indictment     ❏ Information     ❏ Superseding Information     ❏ Complaint
❏ Probation Violation Petition     ❏ Supervised Release Violation Petition     ❏ Violation Notice     ❏ Order of the Court

This offense is briefly described as follows:

T.18:1962(d) -  Racketeer Influenced and Corrupt Organizations (RICO) Conspiracy, count one, et al

Date:     04/18/2024                                   _____
                                                         *Issuing officer's signature*

City and state:    Norfolk, Virginia                Lawrence R. Leonard, United States Magistrate Judge
                                                         *Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____ at *(city and state)* _____ . |
| Date: _____                    _____ <br> *Arresting officer's signature* <br><br> _____ <br> *Printed name and title* |

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division



FILED
IN OPEN COURT

APR 1 7 2024

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **UNDER SEAL**   **24-2924-MJ-MCCABE** |
| | ) | |
| | ) | FILED BY ____ MP ____ D.C. |
| v. | ) | Criminal No.: 2:24-cr-__28__   May 8, 2024 |
| | ) | ANGELA E. NOBLE CLERK U.S. DIST. CT. S. D. OF FLA. - Miami |
| EDUARDO RODRIGUEZ, | ) | **Racketeer Influenced and Corrupt** |
| a.k.a. "Ogbe Bara" | ) | **Organizations (RICO) Conspiracy** |
| (Counts One and Two) | ) | 18 U.S.C. § 1962(d) |
| | ) | (Count One) |
| IDALBERTO RIVERO, | ) | |
| a.k.a. "El Monstro" | ) | **Conspiracy to Launder Monetary** |
| a.k.a. "El Mostro" | ) | **Instruments** |
| a.k.a. "Monster" | ) | 18 U.S.C. § 1956(A)(1)(ii) and (h) |
| (Counts One and Two) | ) | (Count Two) |
| | ) | |
| ANYELO JESUS MUINO AYALA, | ) | |
| a.k.a. "Justin Bieber" | ) | **Criminal Forfeiture** |
| (Counts One and Two) | ) | 18 U.S.C. § 1963(a) and (m) |
| | ) | |
| PEDRO RAUL ZEQUEIRA ALVAREZ, | ) | |
| a.k.a. "Yery Yery" | ) | |
| (Counts One and Two) | ) | |
| | ) | |
| RAUL FERRAO PONS, | ) | |
| a.k.a. "Rauli" | ) | |
| a.k.a. "Raulito" | ) | |
| a.k.a. "Ninja" | ) | |
| (Counts One and Two) | ) | |
| | ) | |
| JORGE ENRIQUE FONSECA | ) | |
| VAZQUEZ, | ) | |
| a.k.a. "Ogberoso" | ) | |
| (Counts One and Two) | ) | |
| | ) | |
| and | ) | |
| | ) | |
| LUIS GUSTAVO DIAZ, | ) | |
| a.k.a. "Ogberdi" | ) | |
| (Counts One and Two) | ) | |
| | ) | |
| Defendants. | ) | |

## INDICTMENT

### April 2024 Term -- At Norfolk, Virginia

THE GRAND JURY CHARGES THAT:

### COUNT ONE
(Racketeer Influenced and Corrupt Organizations (RICO) Conspiracy)

#### The Enterprise

1. Beginning not later than 2014, and at all times relevant to this Indictment, **EDUARDO RODRIGUEZ**, a.k.a. "Ogbe Bara," **("RODRIGUEZ")**, **IDALBERTO RIVERO**, a.k.a. "El Monstro," a.k.a. "El Mostro," a.k.a. "Monster," **("RIVERO")**, **ANYELO JESUS MUINO AYALA**, a.k.a. "Justin Bieber," **("AYALA")**, **PEDRO RAUL ZEQUIERA ALVAREZ**, a.k.a. "Yery Yery," **("ALVAREZ")**, **RAUL FERRAO PONS**, a.k.a. "Raulito," a.k.a. "Rauli," a.k.a. "Ninja" **("PONS")**, **JORGE ENRIQUE FONSECA VAZQUEZ**, a.k.a. "Ogberoso," **("VAZQUEZ")**, and **LUIS GUSTAVO DIAZ**, a.k.a. "Ogberdi," **("DIAZ")**, the defendants, and others known and unknown to the Grand Jury, were members and associates of a criminal organization, namely, the **"RODRIGUEZ ENTERPRISE,"** (hereinafter, "The Enterprise"), which engaged in, among other things, acts involving money laundering, access device fraud, wire fraud, bank fraud, interstate transportation in aid of racketeering, interstate transportation of stolen goods or moneys, and sale or receipt of stolen goods or moneys, and which operated in the states of Virginia, Florida, Maryland, North Carolina, South Carolina, California, Washington, Nevada, Illinois, Arizona, New York, Missouri, Oklahoma, Arkansas, and elsewhere.

2. This criminal organization, including its leadership, membership, and associates, constituted an "enterprise," as defined by 18 U.S.C. § 1961(4), that is, a group of individuals associated in fact. The enterprise constituted an ongoing organization whose members functioned

2

as a continuing unit for a common purpose of achieving the objectives of the enterprise. This enterprise was engaged in, and its activities affected, interstate and foreign commerce.

Background

3.    The Enterprise engaged in gas pump skimming operations throughout the United States to fraudulently acquire credit and debit card information. Gas pump skimming involves the covert installation of portable credit and debit card reading devices, called "skimming devices," in or on gas pumps and, in this case, pumps located within the Eastern District of Virginia and elsewhere.

4.    A skimming device intercepts, reads, and records the information ("track data") encoded on a credit or debit card's magnetic strip while the skimming device is connected to a gas pump card-reading apparatus. Track data includes, but is not limited to, financial information such as credit and debit card account information and personal identification, including the customer's Personal Identification Number ("PIN") access codes and zip codes entered by legitimate customers during transactions at gas station locations.

5.    Track data can be purchased, sold, and transferred electronically and can be used to create cloned credit and debit cards. Cloned credit and debit cards are counterfeit credit and debit cards created using a combination of electronic hardware and software to encode stolen track data onto cards with magnetic strips.

6.    Skimming revenue includes, but is not limited to, gift cards, merchandise, and cash obtained using cloned credit and debit cards.

7.    Cloned credit and debit cards may be used during cash-out operations to obtain skimming revenue from compromised bank accounts. Cash-out operations include using cloned credit and debit cards at automatic teller machines ("ATMs"), banks, point-of-sale kiosks, and

3

fences to illegally obtain skimming revenue from the compromised bank accounts of legitimate owners of the credit and debit cards.

8.      Skimming operations include, but are not limited to, scouting locations for the installation of skimming devices, monitoring skimming devices, retrieving track data from skimming devices, uninstalling skimming devices, creating cloned credit and debit cards using track data obtained from skimming devices, cash-out operations, and using fences to exchange illicit goods for cash.

9.      A fence is a middleman who buys stolen goods, including but not limited to gift cards, track data, and electronics, for less than market value to later resell for a profit.

The Enterprise Structure

10.     The Enterprise was founded by **RODRIGUEZ** in the Miami, Florida area in or about 2014 and was led by **RODRIGUEZ** and other higher-level members.  Enterprise members achieved higher status by demonstrating their loyalty, reliability, and trustworthiness and by a history of completing successful cash-out operations.  Higher-level Enterprise members were given more responsibility, granted access to more information about skimming operations, and given more profitable track data.

11.     Membership in the Enterprise was contingent upon approval by **RODRIGUEZ**. Existing members "vouched" for new or prospective members, who had to demonstrate their value and loyalty to the Enterprise by assisting Enterprise members and associates with skimming operations and related tasks, such as providing transportation for Enterprise members and their associates.

12.     **RODRIGUEZ's** leadership over the Enterprise stemmed from his extensive experience with skimming operations and other fraud schemes, including credit card fraud,

4

skimming device fraud, buying stolen information, and converting stolen information to gift cards, merchandise, or cash and his ability to maintain a clandestine presence.

13.      The Enterprise operated with a tiered structure wherein members and associates of the Enterprise were required to share a portion of the revenue they obtained through their participation in skimming operations with Enterprise leadership, including **RODRIGUEZ**.

14.      To maintain his status within and control of the Enterprise, **RODRIGUEZ** limited the flow of information to certain members and associates of the Enterprise on a need-to-know basis. **RODRIGUEZ** used different, temporary phone numbers to communicate directly with members and associates of the Enterprise.

15.      **RODRIGUEZ** and other Enterprise members maintained a business relationship with **RIVERO**, an associate of the Enterprise, who assembled and sold skimming devices for profit. Enterprise members and associates, including **RODRIGUEZ,** routinely purchased skimming devices from **RIVERO**.

16.      **RIVERO** also operated as a fence for Enterprise members and associates by purchasing items obtained from skimming operations for less than market value.

<u>Manner and Means of the Enterprise</u>

17.      The manner and means by which members and associates of the Enterprise conducted and participated in the conduct of the affairs of the Enterprise included, but were not limited to, the following:

a. Enterprise members and associates used skimming devices on gas pumps.

b. Higher-level Enterprise members determined the locations at which to install the skimming devices by using cellular telephones and computers to search the internet for photographs of potential target locations compatible with the skimming devices.

c. Enterprise members and associates traveled, typically via air, to locations throughout the United States to install skimming devices.

d. Early skimming devices, used from in or about 2014 until in or about 2018, did not have wireless capability and needed to be physically removed from the gas pump to download the track data. Therefore, Enterprise members and associates had to physically uninstall the skimming devices from gas pumps to capture the track data of cards used there. Later gas pump skimming devices, available in or around 2018, still required that the skimming device be physically installed, but the updated devices had wireless capability. Therefore, the skimming devices could transmit track data remotely via cellphone or computer; that is, without the device being removed from the gas pump. The updated skimming devices could also capture zip codes and/or PINs associated with credit and debit cards. Therefore, when using cloned credit and debit cards, Enterprise members and associates no longer had to provide identifications to make purchases, could also obtain cash from ATMs, and could get cash back as part of transactions.

e. Enterprise members and associates created cloned credit and debit cards using the stolen track data.

f. Enterprise members and associates purchased large quantities of gift cards and expensive goods using the cloned credit and debit cards.

g. To evade detection by law enforcement and financial institutions, members and associates of the Enterprise delayed use of the stolen track data for a short period of time.

h. To minimize the number of transactions made with the stolen track data and to evade detection, Enterprise members and associates purchased large quantities of gift cards and expensive items, including Apple iPads and laptops.

i. Members and associates of the Enterprise then sold these items below market price to fences who paid cash.

j. To maximize the potential gain, Enterprise members and associates sorted the card numbers from the stolen track data into categories by searching the leading digits of the card numbers using the internet and/or other sources to determine card types. Numbers associated with higher value credit cards, including "Gold," "Platinum," or "Business" cards, were distributed to higher-level Enterprise members and associates.

k. Members and associates of the Enterprise used e-mail to share and/or distribute stolen track data to other members and associates of the Enterprise and others known and unknown to the Grand Jury.

Purposes of the Enterprise

18.     The purposes of the Enterprise included, but were not limited to, the following:

a. enrichment of members and associates of the Enterprise through skimming operations involving the illicit procurement of gift cards and other goods generated by the skimming operations;

b. moving, disguising, and protecting financial proceeds of the Enterprise's skimming operations by converting proceeds of the illicit operations into untraceable cash; and

c. concealing the Enterprise's scheme to defraud financial institutions by converting stolen track data into gift cards, money orders, and/or cash.

The Racketeering Conspiracy

19.     Beginning in or about 2014 and continuing through on or about the date of the filing of this Indictment, both dates being approximate and inclusive, within the Eastern District of Virginia, and elsewhere, **EDUARDO RODRIGUEZ**, a.k.a. "Ogbe Bara," **("RODRIGUEZ")**,

7

**IDALBERTO RIVERO**, a.k.a. "El Monstro," a.k.a. "El Mostro," a.k.a. "Monster" **("RIVERO")**, **ANYELO JESUS MUINO AYALA**, a.k.a. "Justin Bieber," **("AYALA")**, **PEDRO RAUL ZEQUIERA ALVAREZ**, a.k.a. "Yery Yery," **("ALVAREZ")**, **RAUL FERRAO PONS**, a.k.a. "Raulito," a.k.a. "Rauli," a.k.a. "Ninja," **("PONS"), JORGE ENRIQUE FONSECA VAZQUEZ**, a.k.a. "Ogberoso," **("VAZQUEZ")**, and **LUIS GUSTAVO DIAZ**, a.k.a. "Ogberdi," **("DIAZ")**, the defendants, together and with other persons known and unknown to the Grand Jury, each being a person employed by and associated with the Enterprise, which was engaged in, and the activities of which affected, interstate and foreign commerce, knowingly and intentionally conspired with each other, and others known and unknown to the Grand Jury, to violate 18 U.S.C. § 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity, as defined in 18 U.S.C. §§ 1961(1) and (5), which pattern of racketeering consisted of multiple acts indictable under:

    a.    18 U.S.C. § 1029 (relating to fraud and related activity in connection with access devices);

    b.    18 U.S.C. § 1343 (relating to wire fraud);

    c.    18 U.S.C. § 1344 (relating to financial institution fraud);

    d.    18 U.S.C. § 1952 (relating to racketeering);

    e.    18 U.S.C. § 1956 (relating to laundering of monetary instruments);

    f.    18 U.S.C. § 2314 (relating to interstate transportation of stolen property); and

    g.    18 U.S.C. § 2315 (relating to interstate transportation of stolen property).

35.    It was part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the Enterprise.

<u>Overt Acts</u>

36.    In furtherance of the racketeering conspiracy, and to affect the object and purposes thereof, **EDUARDO RODRIGUEZ**, a.k.a. "Ogbe Bara," **("RODRIGUEZ")**, **IDALBERTO RIVERO**, a.k.a. "El Monstro," a.k.a. "El Mostro," a.k.a. "Monster," **("RIVERO")**, **ANYELO JESUS MUINO AYALA**, a.k.a. "Justin Bieber," **("AYALA")**, **PEDRO RAUL ZEQUIERA ALVAREZ**, a.k.a. "Yery Yery," **("ALVAREZ")**, **RAUL FERRAO PONS**, a.k.a. "Raulito," a.k.a. "Rauli," a.k.a. "Ninja," **("PONS")**, **JORGE ENRIQUE FONSECA VAZQUEZ**, a.k.a. "Ogberoso," **("VAZQUEZ")**, and **LUIS GUSTAVO DIAZ**, a.k.a. "Ogberdi," **("DIAZ")**, the defendants, and others known and unknown to the Grand Jury, committed and caused to be committed various overt acts within the Eastern District of Virginia and elsewhere, including, but not limited to, the following:

(1)    In or about 2014, **RODRIGUEZ** and Co-Conspirator 1 ("CC1") met an individual known to the Grand Jury at a gas station in the Miami, Florida area, where **RODRIGUEZ** purchased a Mini-123 skimming device for approximately $8,000.

(2)    In or about 2014, **RODRIGUEZ** directed CC1 to travel to Maryland to test the Mini-123 skimming device.

(3)    In or about 2014, CC1 traveled to Maryland, where he connected the Mini-123 skimming device to a gas pump and collected track data for approximately one week.

(4)    From about 2014 through about 2017, Enterprise members and associates used the Mini-123 skimming device to conduct skimming operations at gas stations around the United States.

(5)    In or about 2017, **RIVERO** assembled an HC-05 skimming device using materials purchased from an internet electronics retailer, which he sold to members of the Enterprise.

9

(6)     In or about September 2017, CC1 and other Enterprise members and associates purchased a skimming device from **RIVERO** and installed it in an Exxon gas station pump in the Hardeeville, South Carolina area.

(7)     In or about 2017, CC1 and **RODRIGUEZ** installed skimming devices they obtained from **RIVERO** at multiple gas pumps along the I-95 corridor in Virginia, including in and around Ruther Glen, Virginia.

(8)     In or about April 2018, CC1, **AYALA** and other Enterprise members and associates traveled to Virginia to conduct a skimming operation.

(9)     On or about April 21, 2018, CC1, **AYALA** and other Enterprise members and associates drove in and around Virginia to scout locations to use cloned bank cards, including Norfolk, Virginia.

(10)     On or about April 21, 2018, CC1, **AYALA** and other members and associates of the Enterprise used Advantage Financial Federal Credit Union information belonging to victim R.M. to make an unauthorized cash withdrawal at a grocery store in Norfolk, Virginia.

(11)     On or about April 21, 2018, CC1, **AYALA** and other members and associates of the Enterprise used SunTrust Bank information belonging to victim J.B. to make an unauthorized purchase of a prepaid credit card at a grocery store in Chesapeake, Virginia.

(12)     On or about April 21, 2018, CC1, **AYALA** and other members and associates of the Enterprise used SunTrust Bank information belonging to victim J.B. to make an unauthorized cash withdrawal at a grocery store in Chesapeake, Virginia.

(13)     On or about April 21, 2018, CC1, **AYALA** and other members and associates of the Enterprise used Police and Fire Federal Credit Union information belonging to victim M.P. to make an unauthorized cash withdrawal at a grocery store in Virginia Beach, Virginia.

(14)     On or about April 21, 2018, CC1, **AYALA** and other members and associates of the Enterprise used Pentagon Federal Credit Union information belonging to victim K.M. to make an unauthorized purchase of a prepaid credit card at a grocery store in Virginia Beach, Virginia.

(15)     On or about April 21, 2018, CC1, **AYALA** and other members and associates of the Enterprise used Bank of America information belonging to victim D.L.W. to attempt to make an unauthorized cash withdrawal at a grocery store in Virginia Beach, Virginia.

(16)     On or about April 21, 2018, CC1, **AYALA** and other members and associates of the Enterprise used Union Bank information belonging to victim A.S. to make an unauthorized cash withdrawal at a restaurant in Exmore, Virginia.

(17)     On or about April 21, 2018, CC1, **AYALA** and other members and associates of the Enterprise used Zenith/Union Bank information belonging to victim S.M. to make an unauthorized cash withdrawal at a restaurant in Exmore, Virginia.

(18)     On or about April 22, 2018, CC1, **AYALA** and other members and associates of the Enterprise used BB&T Bank information belonging to victim T.C. to attempt to make an unauthorized cash withdrawal at a restaurant in Exmore, Virginia.

(19)     On or about May 14, 2018, a member of the Enterprise rented a vehicle in and around Ft. Lauderdale, Florida and listed CC1 as an authorized alternate driver.

(20)     On or about May 29, 2018, **RIVERO** purchased materials used to manufacture skimming devices from an internet electronics retailer.

(21)     In or about October 2018, CC1, **AYALA**, **DIAZ**, and another Enterprise member transported approximately $150,000 of proceeds from a skimming operation from California to Arizona via automobile.

(22)    In or about October 2018, **RODRIGUEZ** transported approximately $250,000 obtained from a skimming operation from California to Nevada via automobile.

(23)    In or about October 2018, **RODRIGUEZ** and others known and unknown to the Grand Jury deposited a portion of the $250,000 obtained from a skimming operation into bank accounts in the Las Vegas, Nevada area.

(24)    On or about November 7, 2018, Enterprise members and associates shared stolen track data using e-mail.

(25)    On or about November 20, 2018, an Enterprise member sent an email containing track data from approximately 300 stolen credit and debit cards to an e-mail account associated with **RIVERO.**

(26)    On or about November 29, 2018, an Enterprise member sent an email containing track data from approximately 80 stolen credit and debit cards to an e-mail account associated with **RIVERO.**

(27)    On or about November 30, 2018, an Enterprise member sent an email containing track data from approximately 600 stolen credit and debit cards to an e-mail account associated with **RIVERO.**

(28)    On or about December 4, 2018, **AYALA** traveled via plane from Florida to California to conduct a skimming operation.

(29)    On or about December 5, 2018, Co-Conspirator 2 ("CC2"), **ALVAREZ**, and **DIAZ** traveled via plane from Florida to California to conduct a skimming operation.

(30)    On or about December 5, 2018, **RODRIGUEZ** traveled via plane from Florida to Nevada.

(31)  On or about December 5, 2018, **RODRIGUEZ** rented a vehicle in Reno, Nevada for the period December 5, 2018 through December 12, 2018.

(32)  On or about December 5, 2018, **RODRIGUEZ** booked hotel accommodations in Lathrop, California for the period December 5, 2018, through December 8, 2018.

(33)  On or about December 5, 2018, CC1 booked hotel accommodations in California for the period of December 5, 2018, through December 10, 2018.

(34)  On or about December 5, 2018, CC1 rented a vehicle in California for the period December 5, 2018 through December 9, 2018.

(35)  On or about December 5, 2018, **AYALA** rented a vehicle in California for the period December 5, 2018 through December 13, 2018.

(36)  Between on or about December 5, 2018 and on or about December 13, 2018, **RODRIGUEZ, AYALA, DIAZ, ALVAREZ,** CC1, and CC2 drove the rental vehicles in and around California scouting locations and installing skimmers on gas pumps.

(37)  Between on or about December 6, 2018 and on or about December 13, 2018, **AYALA** and CC2 used cellular phones and other electronic devices to search for businesses where Enterprise members could conduct cash-out operations.

(38)  Between on or about December 6, 2018 and on or about December 13, 2018, **RODRIGUEZ, AYALA, DIAZ, ALVAREZ,** CC1, and CC2 purchased gift cards with stolen track data.

(39)  On or about December 6, 2018, **DIAZ** rented a vehicle in California for the period December 6, 2018 through December 13, 2018.

(40)  On or about December 6, 2018, **DIAZ** booked hotel accommodations in the Lathrop, California area for the period of December 6, 2018, through December 9, 2018.

(41)    Between on or about December 6, 2018 and on or about December 13, 2018, **RODRIGUEZ, AYALA, DIAZ, ALVAREZ,** CC1, CC2, and other Enterprise members and associates installed skimming devices on gas pumps in the San Francisco, California area.

(42)    Between on or about December 6, 2018 and on or about December 13, 2018, **RODRIGUEZ, AYALA, DIAZ, ALVAREZ,** CC1, CC2, and other Enterprise members and associates obtained track data from the skimming devices installed at gas pumps in the San Francisco, California, area.

(43)    Between on or about December 6, 2018 and on or about December 13, 2018, **RODRIGUEZ, AYALA, DIAZ, ALVAREZ,** CC1, CC2, and other Enterprise members and associates created cloned credit and debit cards from the stolen track data obtained from skimming devices installed at gas pumps in the San Francisco, California.

(44)    On or about December 6, 2018, **AYALA** conducted a Google Maps search for a Home Depot location in Livermore, California where Enterprise members and associates could cash out cloned credit and debit cards.

(45)    On or about December 6, 2018, CC2 conducted a Google Maps search for a Home Depot location in Sacramento, California where Enterprise members and associates could cash out cloned credit and debit cards.

(46)    On or about December 7, 2018, **AYALA** conducted a Google Maps search for a Home Depot location in Elk Grove, California where Enterprise members and associates could cash out cloned credit and debit cards.

(47)    On or about December 7, 2018, CC2 conducted a Google Maps search for a Home Depot location in Lodi, California where Enterprise members and associates could cash out cloned credit and debit cards.

(48)     On or about December 8, 2018, **AYALA** used Google Maps to search for a Home Depot location in Livermore, California, where Enterprise members and associates could cash out cloned credit and debit cards.

(49)     On or about December 11, 2018, CC2 booked hotel accommodations in Stockton, California for the period of December 11, 2018, through December 14, 2018.

(50)     On or about December 13, 2018, **RODRIGUEZ, AYALA, DIAZ, ALVAREZ,** and CC2 traveled via plane from California to Florida, carrying gift cards they had obtained fraudulently on their persons and in their luggage.

(51)     On February 8, 2019, an e-mail account associated with CC1 sent an e-mail containing track data from approximately 2,500 stolen credit and debit cards to an e-mail account associated with **PONS.**

(52)     On February 12, 2019, an e-mail account associated with **PONS** sent an e-mail containing track data from approximately 50 stolen credit or debit cards.

(53)     On February 19, 2019, CC2 traveled via plane from the Miami, Florida area to the San Francisco, California area to conduct a skimming operation.

(54)     On or about February 19, 2019, CC1 and CC2 rented vehicles in the San Francisco, California area for the period February 19, 2019 through February 26, 2019.

(55)     On or about February 19, 2019, **RODRIGUEZ** rented a vehicle in the Seattle, Washington area for the period February 21, 2019 through February 23, 2019.

(56)     On February 20, 2019, **DIAZ** and **ALVAREZ** traveled together via plane from the Miami, Florida area, to the Seattle, Washington, area to conduct a skimming operation.

(57)     On or about February 20, 2019, **AYALA** traveled from the Miami, Florida area to the Seattle, Washington area to conduct a skimming operation.

15

(58)     On February 21, 2019, **RODRIGUEZ** traveled from the Miami, Florida area to the San Francisco, California area to conduct a skimming operation.

(59)     On or about February 21, 2019, **RODRIGUEZ**, CC1, and CC2 traveled from the San Francisco, California area, to the Seattle, Washington, area to conduct a skimming operation.

(60)     On or about February 21, 2019, **DIAZ** rented a vehicle in the Seattle, Washington area for the period February 21, 2019 through February 25, 2019, and returned the vehicle to the San Francisco, California area.

(61)     Between on or about February 21, 2019, through on or about February 24, 2019, **RODRIGUEZ, VAZQUEZ, DIAZ, ALVAREZ,** CC1, CC2, and other Enterprise members searched for gas stations where they could install skimming devices in the Seattle, Washington area.

(62)     On or about February 22, 2019, **RODRIGUEZ** conducted internet searches to scout for a Chevron gas station in the Tacoma, Washington area, and a Mobil gas station in the Auburn, Washington area.

(63)     Between on or about February 22, 2019 and on or about February 23, 2019, on approximately 20 separate occasions, CC2 used Google Maps to search for Lowe's Home Improvement stores in cities located in Washington state where Enterprise members and associates could cash out cloned credit and debit cards.

(64)     On or about February 22, 2019, **VAZQUEZ** rented a vehicle in the Seattle, Washington area for the period February 22, 2019 through February 23, 2019.

(65)     On February 23, 2019, **RODRIGUEZ** traveled via plane from the Seattle, Washington area, to the Miami, Florida area.

16

(66)     Between on or about February 24, 2019 and on or about February 25, 2019, **AYALA, DIAZ, ALVAREZ,** CC1**,** and CC2 traveled from the Seattle, Washington area to the San Francisco, California with proceeds from the skimming operation.

(67)     On February 24, 2019, **RODRIGUEZ** traveled via plane from the Miami, Florida area to the San Francisco, California area to conduct a skimming operation.

(68)     On or about February 24, 2019, **DIAZ** rented a hotel room from February 24, 2019 to February 25, 2019 in the Grants Pass, Oregon area as part of a skimming operation.

(69)     On or about February 25, 2019, **RODRIGUEZ** rented a hotel room and a vehicle for the period of February 25, 2019 through February 26, 2019 in the San Francisco, California area.

(70)     Between on or about February 25, 2019 and February 26, 2019, **AYALA** and CC2 conducted internet searches to scout for various stores and gas stations in and around the San Francisco, California area.

(71)     On or about February 25, 2019, **RIVERO** purchased materials used to manufacture skimming devices from an internet electronics retailer.

(72)     On February 26, 2019, **ALVAREZ, RODRIGUEZ, AYALA**, and CC2, and another Enterprise member traveled via plane from the San Francisco, California area to the Los Angeles, California area to conduct a skimming operation. **AYALA** and another member of the Enterprise flew on tickets purchased from the same reservation.

(73)     On or about February 27, 2019, **RODRIGUEZ** rented a room at the New York - New York Hotel in Las Vegas, Nevada from February 27 to March 4, 2019. CC1 was listed on the reservation as sharing the room.

(74)     Between on or about March 1, 2019 and March 3, 2019, on approximately 20 separate occasions, CC2 used Google Maps to search for Lowe's Home Improvement stores located in various Arizona towns and cities where Enterprise members and associates could cash out cloned credit and debit cards obtained from part of a skimming operations.

(75)     On March 7, 2019, **DIAZ** and **ALVAREZ** traveled via plane from the Phoenix, Arizona area, to the Chicago, Illinois area to conduct a skimming operation. **DIAZ** and **ALVAREZ** flew on tickets purchased from the same reservation.

(76)     Between on or about March 7, 2019 and on or about April 12, 2019, **RODRIGUEZ, DIAZ, ALVAREZ,** CC2 and other Enterprise members and associates used cloned cards generated from a previous skimming operation to conduct cash-out operations at retail stores in the Chicago, Illinois, area.

(77)     On March 8, 2019, **RODRIGUEZ** traveled via plane from the San Francisco, California area to the Chicago, Illinois area to conduct a skimming operation.

(78)     On or about March 8, 2019, **RODRIGUEZ** and **DIAZ** each rented vehicles for the period March 8, 2019 through March 11, 2019 in the Chicago, Illinois area.

(79)     On March 8, 2019, **VAZQUEZ** traveled via plane from the Phoenix, Arizona area to the Chicago, Illinois area to conduct a skimming operation.

(80)     On March 9, 2019, CC2 traveled via plane from the Fort Myers, Florida area to the Chicago, Illinois area to conduct a skimming operation.

(81)     On or about March 9, 2019, CC2 rented a vehicle for the period of March 9 through March 12, 2019 in the Chicago, Illinois area.

(82)     Between on or about March 10, 2019 and March 11, 2019, CC2 used Google Maps to search for Lowe's Home Improvement and Home Depot stores in cities located in Illinois where Enterprise members and associates could cash out cloned credit and debit cards.

(83)     On March 11, 2019, **RODRIGUEZ** and **ALVAREZ** traveled via plane from the Chicago, Illinois area to the Miami, Florida area.

(84)     On March 12, 2019, CC2 traveled via plane from the Chicago, Illinois area to the San Francisco, California area to conduct skimming operations.

(85)     On or about April 3, 2019, **RODRIGUEZ** and **PONS** flew from Miami to the San Francisco area to conduct a skimming operation.

(86)     On or about April 15, 22, 24, and 25, 2019, CC1 used email to share stolen track data with **RIVERO**.

(87)     On or about April 16, 2019, CC2 traveled to the St. Louis, Missouri area to conduct a skimming operation.

(88)     On or about April 18, 2019, **RODRIGUEZ** flew from Miami, Florida to the St. Louis, Missouri area to conduct a skimming operation.

(89)     On or about April 19, 2019, CC2 received stolen track data from CC1 using e-mail.

(90)     Between on or about May 2, 2019, and May 5, 2019, CC2 used Google Maps to search for Lowe's Home Improvement in cities located in Tennessee where he could cash out cloned credit and debit cards.

(91)     On or about May 8, 2019, **AYALA** possessed approximately five cloned credit and debit cards with handwritten PINs on the back side of the cards.

(92)     On or about May 8, 2019, **AYALA** possessed approximately eight credit card and PIN combinations and photographs of credit cards in his cellular phone.

(93)     On or about May 10, 2019, **PONS** traveled from Miami to the St. Louis, Missouri area to conduct a skimming operation.

(94)     Between on or about May 24, 2019, and May 29, 2019, CC2 used Google Maps to search for Lowe's Home Improvement stores in cities located in Oklahoma, Texas, and Arkansas, where he could cash out cloned credit and debit cards.

(95)     On or about May 25, 2019, CC2 and **RODRIGUEZ** installed skimming devices in and around St. Louis, Missouri.

(96)     Between on or about May 30, 2019, and June 1, 2019, CC2 used Google Maps to search for Lowe's Home Improvement stores in cities located in Missouri where he could cash out cloned credit and debit cards.

(97)     On or about June 30, 2019, CC2 used email to share stolen track data with **RODRIGUEZ**.

All in violation of Title 18, United States Code, Section 1962(d).

## COUNT TWO
(Conspiracy to Launder Monetary Instruments)

### The Conspiracy and its Objects

1.      Beginning in or about 2014 and continuing through on or about the date of the filing of this Indictment, both dates being approximate and inclusive, within the Eastern District of Virginia, and elsewhere, **EDUARDO RODRIGUEZ**, a.k.a. "Ogbe Bara," **("RODRIGUEZ"),** **IDALBERTO RIVERO**, a.k.a. "El Monstro," a.k.a. "El Mostro," a.k.a. "Monster," **("RIVERO"), ANYELO JESUS MUINO AYALA**, a.k.a. "Justin Bieber," **("AYALA"),** **PEDRO RAUL ZEQUIERA ALVAREZ**, a.k.a. "Yery Yery," **("ALVAREZ"), RAUL FERRAO PONS**, a.k.a. "Raulito," a.k.a. "Rauli," a.k.a. "Ninja," **("PONS"), JORGE ENRIQUE FONSECA VAZQUEZ**, a.k.a. "Ogberoso," **("VAZQUEZ"),** and **LUIS GUSTAVO DIAZ**, a.k.a. "Ogberdi," **("DIAZ"),**  the defendants, did knowingly combine, conspire, and agree with other and persons known and unknown to the Grand Jury to commit an offense against the United States in violation of 18 U.S.C. § 1956, to wit: to knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, that is, fraud and related activity in connection with access devices, in violation of 18 U.S.C. §§ 1029 and 2, knowing that the transaction was designed in whole and in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity in violation of 18 U.S.C. § 1956(a)(1)(A)(ii) and (h).

### Manner and Means of the Conspiracy

2.      The manner and means by which **RODRIGUEZ, RIVERO, AYALA,** CC2, **ALVAREZ, PONS, VAZQUEZ,** and **DIAZ,** and other conspirators known and unknown to the Grand Jury sought to accomplish the purpose of the conspiracy included, among others, the following:

21

3.     It was part of the conspiracy that coconspirators purchased stolen debit and credit card information over the internet.

4.     It was further part of the conspiracy that coconspirators created cloned credit and debit cards using the stolen debit and credit card information purchased over the internet. Coconspirators were careful to purchase debit/credit card information from cardholders in the same geographic regions in which they would be cashed out.

5.     It was further part of the conspiracy that coconspirators booked air travel using their true names and dates of birth.

6.     It was further part of the conspiracy that coconspirators traveled to locations throughout the United States, either solo or in pairs, to purchase large quantities of gift cards using the data purchased online.

7.     It was further part of the conspiracy that while conducting criminal activity in a target location, coconspirators rented vehicles and hotel rooms using their true names and legitimate means of identification.

8.     It was further part of the conspiracy that when coconspirators did not have access to cardholders' PINs, they presented false identifications to make purchases using the cloned credit and debit cards. The false identifications were often generated to match the state of the target location or surrounding geographic region. Coconspirators were furnished with multiple false identifications to effectuate criminal activity in target locations using track data purchased from the internet.

9.     It was further part of the conspiracy that prior to leaving a target location, coconspirators frequently shipped large quantities of gift cards to addresses in or around Miami,

Florida. Alternatively, coconspirators traveled from a target location back to Miami with fraudulent gift cards.

10.     It was further part of the conspiracy that lower-level coconspirators transferred gift cards to higher-level coconspirators. Higher-level coconspirators retained a leadership cut and lower-level coconspirators retained the remaining proceeds.

11.     It was further part of the conspiracy that when the first gas pump skimming devices became available, coconspirators determined the locations in which these early gas pump skimming devices would be installed. Coconspirators used instrumentalities of interstate commerce, including cellular telephones, to search the internet for photographs of potential target locations to determine compatibility with the skimming devices.

12.     It was further part of the conspiracy that coconspirators traveled to locations throughout the United States to install these early gas pump skimming devices. These early gas pump skimming devices did not have wireless capability and needed to be removed from the gas pump in order to download the track data. Therefore, it was further part of the conspiracy that coconspirators uninstalled the gas pump skimming devices from gas pumps after a period of time in order to capture the track data of cards used there.

13.     It was further part of the conspiracy that to evade detection by law enforcement and financial institutions, conspirators delayed use of the track data for a period of time.

14.     It was further part of the conspiracy that coconspirators created cloned credit and debit cards using the stolen track data downloaded from the gas pump skimming devices.

15.     It was further part of the conspiracy that to minimize the number of transactions made with the stolen track data and to evade detection, coconspirators frequently purchased large

quantities of expensive items, including Apple iPads and laptops, and then sold these items for cash.

16.     It was further part of the conspiracy that to facilitate the use of the stolen track data, coconspirators sorted the card numbers into categories by searching the leading digits of the card numbers using the internet and/or other sources and used the information provided to determine card types, including whether the cards were designated "Gold," "Platinum," or "Business." More elevated coconspirators received "better" card numbers.

17.     It was further part of the conspiracy that coconspirators used advancements in skimming technology to streamline their operations.

18.     It was further part of the conspiracy that coconspirators used e-mail to share and/or distribute stolen track data to other coconspirators and others known and unknown to the Grand Jury.

In violation of 18 U.S.C. §§ 1956(a)(1)(A)(ii) and (h).

## CRIMINAL FORFEITURE

1.      The allegations contained in this Indictment are re-alleged and incorporated by reference as if fully set forth in support of this forfeiture.

2.      Upon conviction of the offense of RICO conspiracy charged in on Count One, the defendants, **EDUARDO RODRIGUEZ**, a.k.a. "Ogbe Bara," **("RODRIGUEZ")**, **IDALBERTO RIVERO**, a.k.a. "El Monstro," a.k.a. "El Mostro," a.k.a. "Monster," **("RIVERO")**, **ANYELO JESUS MUINO AYALA**, a.k.a. "Justin Bieber," **("AYALA")**, **PEDRO RAUL ZEQUIERA ALVAREZ**, a.k.a. "Yery Yery," **("ALVAREZ")**, **RAUL FERRAO PONS**, a.k.a. "Raulito," a.k.a. "Rauli," a.k.a. "Ninja," **("PONS")**, **JORGE ENRIQUE FONSECA VAZQUEZ**, a.k.a. "Ogberoso," **("VAZQUEZ")**, and **LUIS GUSTAVO DIAZ**, a.k.a. "Ogberdi," **("DIAZ")**, shall forfeit to the United States, pursuant to 18 U.S.C. § 1963:

a.      any and all interest defendants have acquired or maintained in violation of 18 U.S.C. § 1962;

b.      any and all interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which defendant(s) has/have established, operated, controlled, conducted, or participated in the conduct of, in violation of 18 U.S.C. § 1962; and

c.      any and all property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity in violation of 18 U.S.C. § 1962, including, but not limited to, a forfeiture money judgment against the convicted defendant(s) in an amount determined by the Court to represent the total amount of proceeds obtained as a result of the violation.

25

3.      Upon conviction for Count Two, the defendants, **RODRIGUEZ, RIVERO, AYALA,** CC2 **, ALVAREZ, PONS, VAZQUEZ,** and **DIAZ** shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, involved in the offense, or any property traceable to such property.

4.      This property includes, but is not limited to, a forfeiture money judgment against the convicted defendant(s) in an amount determined by the Court to represent the total amount of property involved in the offense, or any property traceable to such property.

5.      Pursuant to 18 U.S.C. § 1963(m) and 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b), if any of the property subject to forfeiture described in paragraphs 2 and 3, as a result of any act or omission of the defendant:

a.      cannot be located upon the exercise of due diligence;

b.      has been transferred or sold to, or deposited with, a third party;

c.      has been placed beyond the jurisdiction of the court;

d.      has been substantially diminished in value; or

e.      has been commingled with other property which cannot be divided without difficulty,

the United States intends to seek forfeiture of any other property of the defendant up to the value of the forfeitable property.

In accordance with 18 U.S.C. §§ 982(a)(1), 1963(a), 1963(m);
21 U.S.C. § 853(p); Fed. R. Crim. P. 32.2.

2.24cr28

Pursuant to the E-Government Act, the original of this page has been filed under seal in the Clerk's Office

A TRUE BILL:

REDACTED COPY

_____
FOREPERSON

JESSICA D. ABER
UNITED STATES ATTORNEY

_____
KRISTEN S. TAYLOR
Pennsylvania State Bar No. 326039
Assistant United States Attorney
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, Virginia 23510-1671
Telephone: 757-441-6331
Fax: 757-441-6689
Email: Kristen.Taylor2@usdoj.gov

_____
BEN TONKIN
New York State Bar No. 5203880
Trial Attorney
Violent Crime and Racketeering Section
U.S. Department of Justice
Washington, DC 20530
Telephone: 202-514-3594
Email: Ben.Tonkin@usdoj.gov

_____
CLAYTON D. LAFORGE
Pennsylvania State Bar No. 84075
Assistant United States Attorney
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, Virginia 23510-1671
Telephone: 757-441-6331
Fax: 757-441-6689
E-mail: Clayton.LaForge@usdoj.gov